UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN F. KNIGHT, JR., ET AL.,

    Plaintiffs and
    Plaintiff Intervenors,

UNITED STATES OF AMERICA

    Plaintiff,

CIVIL ACTION NUMBER:
CV-83-M-1676-S

v.

THE STATE OF ALABAMA, ET AL.,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

I

This case is again before the Court on the July 7, 2005, Request of Alabama State University for an Award of Capital Funds ("Request"). Docket № 3349. By Order of the Court, the Oversight Committee ("OC") was directed to review the University's request and to offer its assessment "on the reasonableness of the request and whether in [its] opinion . . . , the amount [requested] is appropriate or

AO 72A
(Rev. 8/82)

can be reduced consistent with sound educational practices." Docket № 3350 at 1.

The report and recommendation of the Oversight Committee was received by the Court on November 16, 2005, and provided to counsel ("Report"). Docket № 3370. The Order transmitting the OC's Report gave the parties twenty days to offer any comments or file any objections to the recommendation. The State Defendants, (Docket № 3379), The United States (Docket № 3378), Alabama State University (Docket № 3382) and the Knight Plaintiffs (Docket № 3381) all filed comments.

## II

The University seeks "$43,764,432 in Court-ordered capital funds to be used for construction of a science building, an education building and expansion of the library to support the Title VI programs previously awarded to [ASU] by the Court." Request at 8. The microbiology facility will house all the University's biology programs, including the new Ph.D. in Microbiology. The education building will house the School of Education and the Court-ordered Ed.D. program in Education Leadership, Policy and Law. The library expansion is intended to meet the expanded collection requirements not only of the graduate programs in

education and biology, but the allied health programs and the Master of Accountancy program initiated because of Court action.

While the University seeks $43.7m in Court-ordered capital funds, the actual estimated cost of the three facilities is $66.1m. The Oversight Committee's Report details the request of the University, the source of funds, and the basis for the OC's recommendation. The Court quotes at length from the OC's Report.

### Recommendation

There are three projects on which the University is focused: A library expansion for $9,200,000; an education building for $30,182,550; and a microbiology building for $26,744,804. The total for all three facilities is $66,127,354. The Request seeks $43,764,432 in Court-ordered capital funding. The University has informed us that it has $20,000,000 reserved from a previous bond issue that will be spent on costs associated with these three projects. We are further advised that if the Court were to award the full $43.7m, that the almost $2.4m shortfall in funds "will be raised by [ASU] from other sources."

### A.

We have visited the existing library on several occasions and have little doubt that a significant expansion is necessary to adequately house the new collection required as a result of the Court-ordered programs and to meet growing space demands. The sum requested seems reasonable to us, given the nature of the needed renovations. The report of ASU's consultant on the University's current library needs is persuasive and was provided to us by the University on August 15, 2005. We support the expansion of the library as necessary and essential to the full implementation of the new doctoral programs and the allied health program previously approved by the Court. The University has estimated the cost of the library expansion to be $9,200,000, including new equipment and furniture. We believe this amount to be reasonable and defensible

considering the significant renovations and expansion of space necessary to meet the University's legitimate needs.

B.

Of the three facilities, the planning and design work on the education building is most near completion. Of the $30,182,550 in anticipated costs including furniture and equipment, the University estimates that approximately 35.6% or $10,745,000 is directly attributable to space associated with the new Ed.D. program. We believe the allocation of space to the Ed.D. program is reasonable, and that the anticipated total cost of the facility is not excessive given its size and anticipated utilization. The School of Education is one of ASU's largest programs, and currently the program's faculty and students are scattered throughout a number of buildings on campus.

. . .

Of course, as we understand the Court's instructions, only that portion of the facility attributable to the Court-ordered program should be considered for Court-ordered funding. As designed, the building is 105,000 square feet. Approximately 37% or 39,255 square feet of the building is assigned to the doctoral program. We are satisfied that the building as designed is adequate to meet the current and future space needs of the Ed.D. program. We also believe that the distribution of costs and space between the doctoral program and the remaining education curriculum is fair and appropriate. We therefore support the University's allocation of $10,745,000 in capital costs for the construction of that portion of the education building attributable to the Ed.D. program.

While we are neither architects nor professional construction estimators, we are left with a sense that the proposed construction budget for the education building is reasonable given its size and intended use. . . .

C.

. . .

The University has reported to us that it plans to house the following undergraduate and graduate programs in the microbiology

building: The Bachelor of Science in Biology, the Master of Science in Biology, the Ph. D. in Microbiology, and the Biomedical Research and Training Programs. The building size—including assignable and unassignable space—is estimated to be 86,840 square feet. Program space is anticipated to be 47,194 square feet. Of this amount, 20,954 square feet or 44.4% is shared space to be used by all the programs to be housed in the facility. Thirty-three percent (33%) or 15,574 square feet, of the facility is intended for the exclusive use of the Ph.D. program. The remaining 22.6% (10,666 sq. ft.) of the assignable square footage is for the exclusive use of programs other than the Ph.D. program. . . .

The cost of the microbiology facility, including equipment and furniture, is estimated to be $26,744,804. There is obvious cross-utilization of equipment and space. As with the education facility, however, we assume that the total costs associated with a new microbiology building should be shared among those programs that will use the facility. That would include the . . . Court-ordered Ph.D. program and those other biology programs that previously existed in the ASU curriculum.

The University has not attempted to assign any of the 44.4% of "shared" space exclusively to the Ph.D. program in microbiology. We do not think it consistent with the Court's expressed intention to control the cost associated with the Court-ordered programs, to require the State to pay 100% of the cost of the shared space because some percentage of it will be used by the Ph.D. program. Therefore, in consideration of the Court's direction to us to determine—consistent with sound educational judgement—if the University's request can be reduced, we suggest that no more than 60% of the cost associated with the shared space should be paid for through Court-ordered capital funds.

While the planning for the microbiology building is still preliminary, we believe the estimated costs are reasonable and the building plan consistent with sound education practices. . . . Nevertheless, the cost of the new facility, which is certainly needed, cannot all be carried on the back of the Court-ordered program.

Accordingly, we suggest that the Court consider awarding the following amounts for the microbiology facility: Total cost of the

building is $26,744,804. The 44.4% of the building cost attributable to the shared space is $11,874,692; of this amount we believe no more than 60% or $7,124,815 should be attributed to the Ph.D. program with the remaining amount funded by the University from other sources. The 33% of the building cost that is exclusively attributable to the Ph.D. program is $8,825,785. The remaining $6,044,327 in cost is related to programs other than the Ph.D. in Microbiology and should be funded by the University from other sources. Therefore, we recommend that the Court approve $15,950,600 in capital funding for use in the construction of a microbiology building.

### Conclusion

We recommend to the Court that it approve $35,895,600 in capital funds in the following amounts: $9,200,000 for a library expansion, $10,745,000 for a portion of the education building, and $15,950,600 for part of the microbiology building. If the Court approves the approximately $36m in capital funding we recommend, and if the University adds another $20m in current bond proceeds, a total of almost $56m will be available for the construction of these three facilities. We believe with planning and cost management, that the University can construct facilities worthy and adequate of the programs the Court has established at Alabama State University.

Report 2-5 (internal citations to exhibits omitted).

### III
### A

In its comments on the Oversight Committee's recommendation, The United States takes no position on the estimated costs of the facilities but does acknowledge that "[a]dequate facilities are necessary to implement the[] remedial programs and make them viable, and the proposed construction projects appear to

6

be legitimately connected to the programs chosen by ASU and approved by this Court." Docket № 3378 at 2.

The Knight Plaintiffs object to the OC's recommendation to the extent it does not recommend that the State pay the full amount requested by ASU. "Plaintiffs contend that the class they represent is entitled to the full amount of capital funding required to construct and maintain the facilities in which they study and teach at ASU." Docket № 3381 at 2. The Knight Plaintiffs further request that the Court "retain jurisdiction to closely monitor [ASU's] management of [any Court-ordered] capital funds...." *Id.* at 3.

### B

While supporting the recommendation of the Oversight Committee that it be awarded approximately $35.9m, Alabama State University asks the Court to refer the matter to the OC to again consider whether an additional $4.7m in capital funds should be recommended for the microbiology building. ASU "believes the entire 44% called 'shared space' should be credited for Court-ordered funding, not only the 60% recommended by the Oversight Committee, a difference of $4,749,877." Docket № 3382 at 4.

The University's argument is premised on the assertion that the 44% of the microbiology building designated as "shared space" would "be necessary for the Ph.D. program even if no other non-Ph.D. activities were to make use it." *Id.* at

3. "The only difference between 'exclusive Ph.D. program space' and 'shared space' is that whereas facilities in the 'exclusive space' are usable only for the Ph.D. program, the 'shared space' houses laboratories, classrooms and other facilities that can be also utilized by master's or undergraduate students at times they are not being used by the Ph.D. program." *Id.*

While it may be true that 100% of the shared space would nevertheless be necessary if the microbiology building housed only the Ph.D. program, the fact that the facility houses at least two other biology programs besides the Ph.D. makes the shared space required significant larger than if the building housed only the Ph.D. program. Indeed, the cost of the facility generally would be less but for the decision of the University to house its entire biology program under a single roof. There are legitimate and educationally sound reasons for housing all biology programs together and the University has acted wisely in doing so. Educational synergies are created and some economies of scale are achieved by housing together similar academic programs. The 60% of shared space that the Oversight Committee recommends be covered by Court-ordered funds is an appropriate balance between the objectives <u>and</u> limitations of the Remedial Decree.

In not approving the additional funds the University seeks for the microbiology building, the Court is not implying that the University's request is illegitimate or that such funds would not significantly enhance the structure and

operation of the biology building. They undoubtedly would, and so, if the funds can be secured through other sources they should be sought. Ordering the State to pay an additional $4.7m under the requirements of the 1995 Remedial Decree is just not appropriate.

The Oversight Committee correctly notes that the Court has been consistent in its insistence that only those costs that are attributable to the Court decree programs will be ordered by the Court. By and large, the University has followed that approach in coming to the Court with its capital funding requests. The education facility is a good example. The total cost of that 105,000 square foot facility is $30.1m, 35.6% or $10.7m is attributable to the space associated with the new Ed.D. program. According to the OC, the allocation of cost to the Ed.D. program is based on the allocation of space "directly attributable to . . . the new Ed.D. program." Report at 3. It should be no different for the microbiology building. The Oversight Committee's apportionment of "shared space" between the Ph.D. program and the other programs to be housed in the facility is reasonable and appropriate.

C

The State Defendants have filed lengthy comments on the Oversight Committee's Report. Docket № 3379. In its 1991 Remedial Decree, the Court found that ASU was to be provided $9.8m in facilities money to remedy the

vestiges of segregation that persisted with respect to capital funding at ASU. Knight v. State of Alabama, 787 F.Supp. 1030, 1283 (N. D. Ala. 1991). The Court went further and required that in the event the State authorized an education bond issue that ASU was to be granted an additional $4.8m in bond proceeds. Id. see also Docket № 3379 at 3, n. 2. A state bond issue was authorized, and in the end, ASU received approximately $15.5m in capital funding as a result of the 1991 Decree. Id.

Following remand of the case from the Eleventh Circuit Court of Appeals, a second trial was held and the Court ordered the establishment of several new high demand programs at ASU. Knight v. State of Alabama, 900 F. Supp. 272, 370 (N.D. Ala. 1995) ("Knight II"). The Court acknowledged at that time that new construction might be required incident to the establishment of the new programs. Id. In discussing the role of the Oversight Committee with respect to the development of new programs at ASU, the Court noted the following:

> In its report, the [Oversight] Committee shall submit a detailed program review **including its judgment as to the need, if any, for additional facilities**, the requirement for additional faculty, if any, the proposed curriculum and the expected budget for the program including its start-up costs and expected annual costs thereafter.

Knight II at 370 (emphasis added).

After Knight II, the Court entered an order that somewhat contradicted the implication in Knight II. On January 2, 1996, the Court issued an Order with

respect to a motion by ASU to use a portion of the 1991 funds to renovate an existing campus facility. In that Order, the Court noted the following:

> [A]ny construction required because of the new programs the Court has authorized [in Knight II] is to be funded from the [1991] capital monies the Court has ordered the university to receive. If such funds are not available because they have been spent on other projects, then the university will have to secure financing through the normal processes used by state institutions to fund renovations and new construction.

Docket № 2217 at 2.

At the time of the 1996 Order, the Court assumed that the 1991 funding would be sufficient to provide for both the remediation of the ASU physical plant as well as the construction of facilities required to house the newly ordered Court programs.

By December 1998, ASU had filed a second motion seeking to spend the balance of the 1991 capital funds. In that motion, ASU requested approval to sepend $38.3m for capital improvement projects. The funding sources for the projects were: (1) the remaining 1991 capital monies; (2) $4.2m from a 1998 State education bond fund; and (3) approximately $18m from an ASU bond issue.

One of the projects to be built was a new facility to house the Court-ordered allied health programs. The motion requested approval to spend $18m on the allied health building, significantly more than the available funds from the 1991 Remedial Decree. Docket № 2657 at 1. The motion was approved and the

University constructed the allied health building without requesting the Court to award additional State funds. Docket № 2657. The University's motion did not reserve any funding for facilities related to the two doctoral programs authorized by the Court.

In its comments on the OC's Report, the State notes the following:

> [ASU] set its priorities for expenditure of capital funds, knowing and ignoring that capital funds would be needed to start its Ph.D. program[s] in Microbiology [and Education]. **Implementation** of the program[s] is necessary to eradicate a vestige of segregation found to be present in the course offerings of ASU. **Capital improvements** to support the program[s] are necessary not because of past segregative policies of the state, but rather because of decisions made by ASU during the course of this remedial term – decisions to dedicate its available capital funds to other purposes. . . .
>
> If the Court gets to the point of considering the amounts of capital funds needed for the new ASU programs, great weight should be given to the fact that ACHE and [the Oversight] Committee approved the programs taking into account statements of capital needs expressed by ASU at the time of submission. As previously discussed, neither ACHE nor the Committee recommended that the State provide those funds. More importantly to the issue of the amounts needed, no one, including ASU, suggested that the viability of the programs depended upon capital funding beyond that proposed at the time of submission. For its Education program, ASU estimated the start-up capital needs of the program to be $11,250,146. . . . For its Microbiology program, ASU estimated those needs to be $14,906,748. . . . Those numbers should constitute the upper limit of any recommendation made by the Committee, and the Committee should require that ASU provide all, or substantially all, of those funds.

Docket № 3379 at 11 (emphasis in original).

This is not the first time the Court has faced the issue of whether new capital money should be made available to meet the construction costs of facilities designed to house Court-ordered programs. In March 2000, the Court was presented with a motion by AAMU to award an additional $2.4m in new capital funding for the construction of an engineering facility, most of which would be paid for from 1991 capital money. Ultimately the State chose to voluntarily provide the funding, but the Court had made clear that it was prepared to act if the State did not. Docket № 2802 at 11-12.

The Court took the opportunity occasioned by AAMU's motion to make certain observations that suggest the Court had underestimated the need for additional capital funding to fulfill the curricular requirements of the 1995 Remedial Decree. It is simply the case that programs without adequate facilities are programs with no opportunity for growth and little opportunity for success. As the Court noted in its March 2000 Order, "[h]ad [it] . . . been sufficiently prescient, it would certainly have been more flexible in its language so as to provide a less difficult environment within which to respond to legitimate changing circumstances." Id. at 7. That same observation applies today.

The simply fact is that the Court made a miscalculation and compounded that miscalculation by reiterating it in its January 1996 Order. Docket № 2217. Over the years the Court has tried to give the State as high a degree of certainty

and direction regarding the costs of this case as is possible. On the issue of capital funding needs, the Court did not manage to meet its own worthy objective.

IV

**ACCORDINGLY**, the Court adopts the Oversight Committee's recommendation with respect to ASU's request for an award of capital funds (Docket № 3370) and DIRECTS that ASU be provided $35,895,600 in capital funding. The decision of how best to appropriate these funds is to be determined by the Governor and the Legislature. The payment of these funds may be spread out over two fiscal years, provided that at least one-third of the awarded amount be paid on or before the start of the fiscal year 2007-2008. To the extent the Legislature authorizes a capital bond issue for education, these funds may in whole or in part be paid from said bond issue. Any balance remaining unpaid after FY 07-08 shall be adjusted by the CPI rate of inflation as determined by the appropriate federal agency.

The request of the Knight Plaintiffs that the Court retain jurisdiction to monitor ASU's expenditure of these Court-ordered capital funds will be deferred and taken up at the time the Court rules on the various motions to continue the Remedial Decrees.

IT IS SO ORDERED this ___8th___ day of February 2006.

HAROLD L. MURPHY, JUDGE
UNITED STATES DISTRICT COURT